## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        *Plaintiff,*

  vs.                         Case No. 21-10016-01-EFM

RANDY SPORN,

        *Defendant.*

---

### MEMORANDUM AND ORDER

The government has charged Defendant Randy Sporn with sexual exploitation of a child, commission of a felony with a minor while required to register as a sex offender, and possession of child pornography, in violation (respectively) of 18 U.S.C. §§ 2251(a), 2260A, and 2252A(a)(5)(B).  The matter is before the Court on Defendant's motion to suppress evidence from his interview with police shortly after his arrest (Doc. 44).

### I.      Factual Background

Police arrested Defendant on March 11, 2021, as law enforcement officers executed search warrants of Defendant's residence and workplace.  The arrest and searches took place as a result of the officers' investigation of the use of two Twitter accounts to access child pornography.  The Court denied a previous motion to suppress the issuance of those warrants, holding that Defendant's Fourth Amendment rights were not violated when the government obtained the warrants based on reports from the National Center for Missing and Exploited

Children (NCMEC) passing along information from the Twitter messaging service that two of its accounts had sent or received child pornography.

Wichita Police Detective Sergeant Stephanie Neal and Homeland Security Investigations Special Agent John Ferreira investigated the NCMEC report, and worked to identify the actual owner of the two Twitter accounts.  The NCMEC tipline report included a telephone number associated with the Twitter accounts, and Detective Neal matched this number to Defendant, a registered sex offender.  Using the Internet Protocol (IP) address associated with both Twitter accounts, Detective Neal obtained state search warrants for various electronic service providers in order further identify the person behind the accounts.  From the responses to these warrants, the investigators were able to further associate the Twitter accounts with a residence on Carter Street in Wichita, Kanas.

Defendant was handcuffed and arrested at his residence.  He was then transported to a police interview room.  The government agrees that the interview that followed was custodial.

The interview was recorded.  Det. Neal asked questions based on a personal history sheet, including asking Defendant about his phone number and residence.  Defendant asked for and received a copy of the search warrant.  Defendant reviewed the warrant, and asked several questions, including whether officers were still at the house, the condition of the house, "where is Nate?" in apparent reference to his housemate, and what were the mortgage documents mentioned in the warrant.  During the period, the investigators had not yet given Defendant his *Miranda* rights.

Defendant moves to suppress his responses to questions during the interview.  After the government indicated it may solicit evidence of his non-reaction to being accused of accessing child pornography, he has also moved to suppress any evidence relating to such silence or lack of

response.  The Court held a hearing on Defendant's motion and enters present Order resolving the issues raised by the parties.

## II.     Legal Standard

The Fourth Amendment states: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."[1]   Under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure."[2]  If a search or seizure violates the Fourth Amendment, the "fruit of the poisonous tree" doctrine prohibits the admission of any subsequently obtained evidence, including information, objects, or statements, that was derived from such evidence.[3]  Searches must be authorized by a warrant unless an exception to the warrant requirement applies.[4]   The government bears the burden to prove that a warrantless search or seizure was justified.[5]

To protect a suspect's Fifth Amendment right against self-incrimination, law enforcement officers must administer the prophylactic warnings set forth in *Miranda v. Arizona*[6] before interrogating any suspect held in custody.  Failure to advise a suspect of the *Miranda* rights may render inadmissible incriminatory statements made during a custodial interrogation.[7]

---

[1] U.S. CONST. amend. IV.

[2] *United States v. Calandra*, 414 U.S. 338, 347 (1974) (citations omitted).

[3] *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

[4] *California v. Carney*, 471 U.S. 386, 390 (1985).

[5] *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001) (citations omitted).

[6] 384 U..S. 436, 444 (1966).

[7] *Id*. at 492.

### III.    Analysis

**A.    Defendant's Pre-*Miranda* responses to Government Questions**

Defendant asks that the Court suppress his statements during the interview that the house at the address listed in the search warrant belonged to him, and that the phone number linked to one of the Twitter accounts was his.  Defendant argues that, under the circumstances of the case, this information was incriminating and elicited during a custodial interrogation.  The government argues these inquiries were part of the normal booking process, and thus permissible under *Miranda.*

For purposes of deciding if a booking question is permissible, "the test is an objective one asking whether the questioning under the circumstances was reasonably likely to elicit incriminating information relevant to establishing an essential element of the crime charged.  The officer's actual belief or intent in asking the questions is relevant, but it is not conclusive."[8]  Otherwise standard booking information, including a telephone number, may be incriminating information under the circumstances of a given case.[9]

In support of its argument, the government cites two cases also noted in Defendant's motion — *United States v. Abe,*[10] and  *United States v. Laurezo.*[11]  The government notes that in *Abe* the police repeatedly inquired into the defendant's residence, and the court found "it is therefore impossible to distinguish which questions were merely for the purpose of booking and

---

[8] *United States v. Abe,* 2021 WL 5371462, at *5 (D.N.M. 2021) (citations omitted).

[9] *See United States v. Marquez,* 2002 WL 35649554, at *10 (D.N.M. 2002) ("Defendant Marquez's identification of his mobile telephone number [during booking] was incriminating information because it provided additional evidence linking him to Officer Lucero's three telephone calls regarding the sale of the cocaine, and the incriminating nature of that information was obvious to the officers and agents involved in the undercover operation.").

[10] 2021 WL 5371462, at *5.

[11] 2019 WL 2453822 (D.N.M 2019).

which were for the purpose of interrogation."[12]   The government contends that the *Abe* court suppressed the answers because the questions "departed from routine booking questions."

But the *Abe* court did not suppress the defendant's answers because the questions themselves were unusual, but because where defendant lived was an important part of the case against him.  In addition, the court noted, the "booking form" was not completed by an ordinary booking officer, but by the case agent who filled out the criminal complaint, a person who

> knew the necessary facts of the case and how they related to his charges. As the case agent, she knew that identity was a contested issue in his case. She testified that she already knew the general area where Defendant lived, which is important to the case as he lived directly behind where the crime occurred and in the school district of Highland High School, a school name depicted on the hoodie that surveillance footage showed the perpetrator wearing.[13]

Thus, the court wrote, "regardless of Agent Recci's intent behind each question, they all were reasonably likely to elicit incriminating information given her intimate knowledge of the case and the fact that identity was a central issue in the case."[14]

Both factors are at play in the present case as well—the "booking questions" were advanced by detectives familiar with the issues in the case, and identity of the person using the Twitter accounts is one of the key issues in the case.

The government also cites a portion of the *Laurezo* opinion, in which the court found *some* of the booking questions legitimate:  "The Court does not find, and Ms. Laurezo does not direct the Court to any evidence that Detective Valderaz asked if she understood English for an

---

[12] *Id*. at *6.

[13] *Id*. at *6.

[14] *Id.*

5

underhanded purpose, such as to incriminate her or to establish an essential element necessary for conviction."[15]

But in the next paragraph, which the government does not note, the court found that other "routine booking questions" were improper under the circumstances of the case. This included a question about the defendant's cellphone number:

> However, Detective Valderaz' questions regarding Ms. Laurezo's cellphone number, time spent in the United States, current address, and relationship with Dain Adams were reasonably likely to elicit incriminating information. Specifically, before the interview began, Detective Valderaz knew that Ms. Laurezo's cellphone contained direct evidence of child pornography. (In speaking with Ms. Laurezo, Detective Valderaz explained, "you're in trouble because of what you have on this phone."). Therefore, admitting her cellphone number, and thus ownership of the cellphone, is undoubtedly incriminating when the cellphone contains evidence of the crime being investigated.[16]

The court reached the same result about an inquiry into the defendant's address:

> [A]sking Ms. Laurezo about her previous travels in the United States and her current residence in Roswell, New Mexico was reasonably likely to elicit incriminating information. Indeed, in questioning Ms. Laurezo about whether she downloaded child pornography, Detective Valdreaz [sic] used her prior pre-*Miranda* statement, that she had been in Roswell, New Mexico since March, against her: "You've already told us that you've been here since March." Her statement before she waived her *Miranda* rights therefore later incriminated her when it tied her to the date and location where evidence of child pornography was downloaded. It is therefore evident that this information established an essential temporal and locational link for a conviction of possession of child pornography.[17]

The government suggests a Tenth Circuit case, *United States v. Medrano*,[18] as the one "most similar" to this action. In *Medrano*, an ICE Agent asked a defendant detained on

---

[15] 2019 WL 2453822 at *7.

[16] *Id.* (record citation omitted).

[17] *Id.* at *8 (record citations omitted).

[18] 356 F. App'x 102 (10th Cir. 2009), *partially overruled on other gds., Bloate v. United States*, 559 U.S. 196 (2010).

immigration charges about his country of birth.  The court held that the question did not violate defendant's *Miranda* rights, as it was part of a routine booking process.[19]

*Medrano* is in fact further from this case then either *Abe* or *Laurezo*, in both of which (as here) there was an issue as to the identity of the perpetrator of the crime.  In *Medrano*, on the other hand, the court expressly noted that, because the defendant's name and immigration status had been previously established by fingerprints, the booking agent "did not need to confirm [his] identity by getting him to admit his name."[20]  Because the agent "already had ample information about and evidence of Defendant's name, citizenship, and prior removals,"[21] the court distinguished the case from its earlier decision in *United States v. Parra*,[22] which held that it would be a *Miranda* violation to ask a defendant "his true name" in order to "help . . . determine whether [he] was in the country illegally."

The government argues that it has other evidence to establish that Defendant owned the house in question and that it was his cellphone which was linked to the Twitter identities.  But the government's other evidence is not necessarily conclusive on the issue of identity, as was the fingerprint evidence in *Medrano*.  At the hearing on Defendant's motion, the government indicated its intention to link the Defendant to the Twitter accounts through other evidence, and only use Defendant's statements at the interview in the event the other evidence is somehow unavailable.

---

[19] *Id*. at *3-4.

[20] *Id*. at *4.

[21] *Id*. at *4 n. 5.

[22] 2 F.3d 1058, 1067 (10th Cir. 1993).

But this simply confirms that the interview statements by Defendant are probative of an issue in the case. And because they were issued while in custody and prior to *Miranda* warnings, they are not admissible.

**2.      Silence or Demeanor of the Defendant**

The government also seeks to introduce, or at least potentially introduce, evidence of Defendant's silence and demeanor during the remainder of the interview. It argues that Defendant's "silence was not in response to any question by law enforcement," and that his reaction after "review[ing] the search warrant (which contained express references to child pornography, Twitter, and various accounts) was notable for his lack of surprise." It contends that evidence of this reaction is not testimonial in nature, but simply evidence of his demeanor during the investigation, and thus is not protected by *Miranda*.

The government cites as authority the Eleventh Circuit's decision in *United States v. Rivera*,[23] but there are several problems with this authority in the context of the present case. First, the decision itself suggests that distinguishing between a suspect's "silence" and "demeanor" (with the first being out of bounds for comment, while the second is fair game) is artificial—the court noting "the rather inscrutable problem of determining whether there exists a rational distinction between impermissible comments showing that the defendant is being *silent* and permissible comments indicating that the defendant is *acting silent*."[24]

> The complexity posed in this case is deciding what actually is "silence" within the context of the *Miranda* warnings. Although both logic and common sense dictate that "silence" is more than mere muteness, there is no definite outer boundary in determining what types of nonverbal conduct or demeanor, whether assertive or

---

[23] 944 F.2d 1563 (11th Cir. 1991)

[24] *Id*. at 1568 (emphasis in original).

nonassertive, a prosecutor may permissibly comment on without running afoul of the dictates of *Miranda*. Rather, there are difficult levels of gradation between types of human behavior that constitute a purely physical act and behavior that is solely a communication. For instance, in this case, Schor's testimony about Vila's demeanor after exercising her right to remain silent is perhaps probative of her state of mind; a suspect can act silent in many ways that may be inconsistent with innocent knowledge. On the other hand, if the government's position was accepted, we might force future defendants into the unenviable predicament of expressing their innocence *nonverbally* through flailing arms, shaking heads, furtive glances or the like, lest the government draw negative inferences from a defendant's passive silence.[25]

Second and more importantly, to the extent *Rivera* does hold it is permissible to comment on a defendant's post-arrest but pre-*Miranda* silence, the case is *dicta* at multiple levels. The court stressed that "[t]he record does not state whether [defendant] was in custody at the time" when she gave the statements."[26] Further, even for comments about defendant's silence after she was given *Miranda* warnings, the court concluded any error was harmless under the circumstances of the case.[27]

Third, *Rivera* was decided in 1991 and precedes numerous subsequent decisions which have directly addressed the propriety of commenting on a defendant's silence while in custody but before *Miranda* warnings have issued, including *Salinas v. Texas*,[28] which was discussed extensively in Defendant's motion to suppress. The response of the government does not mention *Salinas*, or any of other more recent decisions which have expressly addressed the issue.

In *Salinas*, the Supreme Court repeated the general rule that a witness seeking the protection of the Fifth Amendment must formally invoke his right to silence, a rule with only

---

[25] *Id*. at 1569 (emphasis in original).

[26] *Id*.

[27] *Id*. at 1569.

[28] 570 U.S. 178 (2013).

two recognized exceptions:  (1) "a criminal defendant need not take the stand and assert the privilege at his own trial," and (2) where "governmental coercion makes his forfeiture of the privilege involuntary."[29]   The defendant asked the Court to recognize a third exception, that a formal invocation is not required where the defendant "stands mute" while being interviewed by government officers.[30]  The Court refused to do so.

The decision of the fractured *Salinas* Court is not controlling here, because the interview in question in *Salinas* was noncustodial.  The defendant, a guest at a party where a shooting occurred, "accompan[ied] police to the station of questioning," and "[a]ll agree that the interview was noncustodial."[31]

As noted earlier, the three member plurality led by Justice Alito refused to create an new, third exception to the requirement of a formal invocation of the right to silence.  Justices Thomas and Scalia concurred in the result, on the grounds that the silence was pre-custodial, and more fundamentally, on the grounds that *Griffin v. California*,[32] which held that adverse comment on a defendant's silence was improper, was in error.  The four remaining Justices dissented.

Because *Salinas* did not involve a custodial interrogation, it is not directly controlling here.  But the opinions which were rendered suggest that seven Justices might hold that the government cannot comment on silence which is custodial but pre-*Miranda*.  Writing for the plurality, Justice Alito elaborated on the second of the two exceptions to the requirement of a formal invocation, governmental coercion:

---

[29] *Id*. at 184.

[30] *Id*. at 186.

[31] *Id*. at 182.

[32] 380 U.S. 609 (1965).

> [W]e have held that a witness' failure to invoke the privilege must be excused where governmental coercion makes his forfeiture of the privilege involuntary. Thus, in *Miranda*, we said that a suspect who is subjected to the "inherently compelling pressures" of an unwarned custodial interrogation need not invoke the privilege.  Due to the uniquely coercive nature of custodial interrogation, a suspect in custody cannot be said to have voluntarily forgone the privilege unless he fails to claim it after being suitably warned.[33]

Even though *Salinas* is not controlling, it suggests the Fifth Amendment would apply here, where the interview is custodial but *Miranda* warnings had not issued.[34] .

A majority of circuits addressing the issue have held that the government may not comment on silence which occurs in a custodial setting prior to *Miranda* warnings.[35]  A minority has held otherwise, although some of the authority is equivocal.[36]

---

[33] *Id.* at 184-185 (citations, internal quotations, and alterations omitted).

[34] *See United States v. Wilchombe*, 838 F.3d 1179, 1191 (11th Cir. 2016) ("Where, as here a suspect is in custody, he 'cannot be said to have voluntarily forgone the privilege [against self-incrimination] unless he fails to claim it after being suitably warned,' " but concluding that district court did not abuse discretion in refusing to grant mistrial based on comment on post-arrest, pre-*Miranda* silence, given the circuit split and prior Eleventh Circuit precedent) (quoting *Salinas*, 570 U.S. at 184-85 (alterations and internal quotation marks omitted))).

[35] *United States v. Velarde-Gomez*, 269 F.3d 1023, 1028–30 (9th Cir. 2001) (*en banc*); *United States v. Moore*, 104 F.3d 377, 385 (D.C. Cir. 1997) ("custody and not interrogation is the triggering mechanism for the right of pretrial silence under *Miranda*"); *United States v. Hernandez*, 948 F.2d 316, 323 n. 4 (7th Cir. 1991); *Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2000) ("use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment"); *Coppola v. Powell*, 878 F.2d 1562 (1st Cir. 1989) (pre-*Miranda* "refusal to confess" protected by the Fifth Amendment); *United States v. Elkins*, 774 F.2d 530, 538 (1st Cir.1985) (evidence of defendant's apparent lack of surprise when arrested and given *Miranda* warnings violated due process).  *See generally United States v. Green*, 541 F.3d 176, 188 (3d Cir. 2008), *vacated on other gds*., 304 F. App'x 981 (2008), *and on reh'g*, 556 F.3d 151 (2009) (noting the circuit split with the resulting "somewhat thorny question of whether the prosecutor's references to Defendant's technically pre-*Miranda* non-responsiveness may separately arise to constitutional error").

[36] *See United States v. Cornwell*, 418 F. App'x 224, 227 (4th Cir. 2011); *United States v. Judge*, 447 F. App'x 409, 418 (3d Cir. 2011); *United States v. Frazier*, 408 F.3d 1102, 1109 n. 3, 1111 (8th Cir. 2005) (not a violation for government to comment on defendant's silence "during and just after his arrest," while at the same time recognizing that the privilege under *Griffin* "extends to at least the time of custodial interrogation," and finding any error was harmless because of "overwhelming evidence of guilt"); *United States v. Salinas*, 480 F.3d 750, 759 (5th Cir. 2007) (defendant had not shown plain error in the government's substantive use of his post-arrest, pre-*Miranda* silence as "the law remains unsettled"); *Rivera*, 944 F.2d at 1568 n. 12 (the obligation to refrain from comment on defendant's silence arises not when defendant was "technically in custody, but when she was given her *Miranda* warnings and thereby given the implicit assurance that her silence would not be used against her").

Among the more recent decisions, the Eleventh Circuit has cited *Salinas* and observed that "[w]here, as here a suspect is in custody, he 'cannot be said to have voluntarily forgone the privilege [against self-incrimination] unless he fails to claim it after being suitably warned.' "[37] The court found that *Salinas* was not controlling as the defendant in that case was not in custody, and concluded that the district court had not abused its discretion in refusing to grant mistrial based on the prosecutor's comment on defendant's post-arrest, pre-*Miranda* silence, given the circuit split and prior Eleventh Circuit precedent.[38]

No Tenth Circuit precedent exists which would make such silence fair game; the court has not directly addressed the issue.[39] However, it has stressed the "invocation of the privilege against self-incrimination must be given a liberal construction," and "does not require any special combination of words."[40] As a result, the court in *United States v. Burson* found that a defendant's silence itself may effectively act as an invocation of the right to silence, observing that "[w]hether Mr. Burson was advised of his privilege against self-incrimination is immaterial. What is important is that Mr. Burson clearly was not going to answer any of the agents' questions."[41] That is, the duty to refrain from comment on a defendant's silence is not entirely dependent on whether *Miranda* warnings were issued.

---

[37] *Wilchombe*, 838 F.3d at 1191 (alteration in original).

[38] *Id.*

[39] *See United States v. Thomas*, 2016 WL 9819560, at *16 (D.N.M. 2016) (noting the absence of controlling Tenth Circuit authority, but citing *United States v. Caro*, 637 F.2d 869, 876 (2d Cir. 1981) and holding that "the longstanding course charged by the Second Circuit to be the most prudent, that '[the] use of defendant's pre-*Miranda* silence is impermissible.' "). Evidence of post-arrest, pre-*Miranda* silence may be admissible for impeachment purposes. *See Bland v. Simmons*, 459 F.3d 999, 1022-23 (10th Cir. 2006) (citing *Fletcher v. Weir*, 455 U.S. 603, 606 (1982) (per curiam)); *United States v. Chimal*, 976 F.2d 608, 611 (10th Cir. 1992).

[40] *United States v. Burson*, 952 F.2d 1196, 1200 (10th Cir. 1991) (citing *Hoffman v. United States*, 341 U.S. 479, 486 (1951); *Quinn v. United States*, 349 U.S. 155, 162 (1955)).

[41] *Id.* at 1200-01 (emphasis added).

*Burson* may not be directly controlling here, as the defendant in that case repeatedly refused to answer questions, in a manner which made it "clear [defendant] would not answer any of the agent's questions."[42]  Here, the interrogating officers did not directly ask Defendant any questions, and the government seeks to use his nonreaction after reading the search warrant (with its allegations of child pornography) against him.  But *Burson* remains relevant, as the court clearly indicated that the right to silence may be invoked by inference, and may arise even before any *Miranda* warnings have been issued.[43]

The government stresses that the officers conducting the interrogation did not explicitly ask Defendant any questions; it simply seeks to introduce evidence of his demeanor after reading the search warrant, responding only with several mundane questions such as the location of his housemate and about the mortgage documents mentioned in the warrant.  But this not only does not solve the constitutional problem, it raises an additional problem from an evidential standpoint—whether Defendant's nonresponse to nonquestions is probative and admissible.

The Supreme Court cautioned in *Doyle v. Ohio*[44] that such "silence at the time of arrest may be inherently ambiguous even apart from the effect of *Miranda* warnings, for in a given

---

[42] *Id*. at 1200.

[43] Citing *Burson*, the authorities summarizing the circuit split have uniformly placed the Tenth Circuit among the majority holding that prosecution may not comment on post-arrest pre-*Miranda* silence.  *See Wilchcombe*, 838 F.3d at 1190; *Jones v. Trombley*, 307 F. App'x 931, 933-34 (6th Cir. 2009); *Green*, 541 F.3d at 188 n. 12; *United States v. Pando Franco*, 503 F.3d 389, 395 n. 1 (5th Cir. 2007); *United States v. Muhammed*, 502 F.3d 646, 657 n. 7 (7th Cir. 2007); *United States v. Osuna-Zepeda*, 416 F.3d 838, 847 (8th Cir. 2005) (Lay, J., concurring); *Flowers v. Noeth*, 2021 WL 4267814, at *16 n. 11 (N.D.N.Y. 2021);  *United States v. Enix*, 2018 WL 852116, at *3 (W.D.N.Y. 2018).  *See also United States v. Baca*, 409 F. Supp. 3d 1169, 1250 (D.N.M. 2019) ("In the Tenth Circuit, a prosecutor cannot comment for substantive purposes on a defendant's silence even when that silence occurred during a non-custodial interrogation." (citing *Burson*, 952 F.2d at 1200-02).

[44] 426 U.S. 610 (1976).

case there may be several explanations for the silence that are consistent with the existence of an exculpatory explanation," with the result that the silence is "of dubious probative value."[45]

The Court has subsequently clarified that *Doyle*'s prohibition of comment on post-*Miranda* silence rests on considerations of fundamental fairness, as the government's warning may have induced the defendant to remain silent.[46]  In *Brecht v. Abrahamson*, the Court agreed that pre-*Miranda* silence may be sufficiently probative of guilt to be used for impeachment purposes, as such use does not violate "any implied assurance by law enforcement authorities that it will carry no penalty."[47]

But the generally ambiguous nature of silence as evidence, as recognized in *Doyle*, is compounded here, precisely because no questions were posed.  Defendant's silence while reading the warrant may indicate a consciousness of guilt, the *sang froid* of an unrepentant criminal.  Or it may reflect the shock of an innocent person being in custody, a limited mental capacity, an emotional inability to process the full extent of what was happening, or even an independent awareness of his right to silence.  Perhaps, indeed, Defendant was simply waiting for his interrogators to ask some specific questions.

Given the custodial nature of the interrogation, the Court finds, consistent with *Burson* and *Salinas*, that Defendant was not required to vocally invoke his Fifth Amendment rights, and holds that the government may not refer to the silence or demeanor of Defendant during its case

---

[45] 426 U.S. at 619 n. 8 (citing *United States v. Hale*, 422 U.S. 171, 177 (1975)). *See United States v. Massey*, 687 F.2d 1348, 1354 n. 2 (10th Cir. 1982) (because the defendant's conviction was reversed on constitutional grounds, the court declined to the additional question of whether "evidence of defendant's prior silence is of so little probative worth that its value is outweighed by its prejudicial effect").  *See Hale*, 422 U.S. at 176 ("In most circumstances silence is so ambiguous that it is of little probative force.").

[46] *See Salinas*, 80 F.3d at 757 n. 5 (citing *Brecht*, 507 U.S.at 628).

[47] *Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993) (citation omitted).

in chief.   Independently, the Court finds that such evidence is not admissible as substantive evidence, as it is inherently speculative under the circumstances of this case.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Doc. 44) is **GRANTED**, as provided herein.

**IT IS SO ORDERED**.

Dated this 5th day of July, 2022.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE